UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 4:11CV2171 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Plaintiff Daniel Lange's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, *et. seq.* Claimant Lange brings this action asserting disability due to degenerative disc disease, residuals from a fractured left ankle, depression, anxiety, and bipolar disorder. The Administrative Law Judge concluded that Lange was not disabled. Lange appeals the decision denying his disability benefits. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

### Procedural History

On May 10, 2010, Daniel Lange filed for Disability Insurance Benefits. Lange applied for Supplemental Security Income on May 14, 2010. The Social Security Administration denied his claims, and he filed a request for a hearing on September 2, 2010. Lange then appeared and testified at a hearing on January 5, 2011. The Administrative Law Judge (ALJ)  issued an opinion upholding the denial of benefits on February 25, 2011. On December 19, 2011, the Appeals Council for the

Social Security Administration denied Lange's request for review. The ALJ's opinion thus stands as the final determination of the Commissioner. Lange filed this appeal on December 15, 2011.

## Testimony Before the ALJ

At the time of the administrative hearing, Lange was thirty eight years old. He has a ninth-grade education. He has never been married and has no children. He was 5'8" and weighed 130 pounds. He has the ability to read, write, and do simple arithmetic. However, he is  unfamiliar with email. He lives in a house with his 75 year-old mother. He smokes a pack of cigarettes each day. He testified that he does not currently drink alcohol. He used to drink alcohol until he was arrested for a DWI at the age of 23 or 24. He testified that he has never used illegal drugs.

He has a driver's license and stated that he drives to the grocery store, to doctor's appointments, and to the pharmacy. He cooks frozen food and assists his mother in doing the laundry. The washer and dryer are located in the basement. He stated that he and his mother work together to carry in groceries and packages. Until this year, Lange cut the grass and did yard work. He claimed that this year he paid a neighbor to complete these tasks. Later, when asked if he currently works outside, Lange stated that he does yard work. In contradiction to his prior statement, he told the ALJ that he mows the grass.

Lange stated that he could walk for thirty minutes before his foot hurt. He testified that he could stand for roughly the same amount of time. According to Lange, he has no problems sitting. His pain is alleviated when he sits. Later, Lange stated that a bulging disc sometimes causes pain when he sits. He testified that he can lift ten to twenty pounds. According to Lange, he can only sit for thirty minutes to an hour without pain medication.

Lange left school after the ninth grade to work as a self-employed mechanic for three or four

years. Lange was last employed in 2008. From 1991 to 1997, Lange claimed no earnings. He testified that he was sick at that time with bipolar manic episodes. Lange does not remember working at IRC, Inc. in 1997.  He does not remember where he worked in 1998. He was unemployed from 1998 until 2001 and does not remember what he did during that span. Lange does not recall where he worked in 2001.

In 2005, Lange was self-employed, cleaning properties in foreclosure. He would run an advertisement in the newspaper to attract business. Lange continued to be self-employed, cleaning trash from homes and yards in 2006, 2007, and 2008. In 2009, Lange did not work .

Lange fell from a ladder while attempting to trim a tree limb at his house in April of 2010. Lange testified that he broke his ankle and two bones in his back from the fall. He testified that he had not gotten his foot fixed and his back still had not healed.

Lange testified that he suffers from headaches, but he has not seen a neurologist. The ALJ noted that Lange appeared to be experiencing some mild degenerative changes in his spine at L3-4 and L5-S1. Lange stated that he has not had any surgeries on his back or had any injections.

At the time of the hearing, Lange had not taken Seroquel for his bipolar symptoms in three days.  Lange stated that he occasionally hears voices. He described the voices as a loud talking blur. Lange testified that he was taking Trazodone off and on, and he did not currently have any Percocet. He also took Klonopin but needed a refill.

According to Lange, he sees five doctors.  Lange testified that he goes to a pain management clinic once every two months.

He also claims to suffer from panic attacks. When he can get the medication, it helps his symptoms. He stated that Dr. Raza refused to prescribe the medication because it is addictive. Lange

suffers from insomnia, eating problems, and memory problems. However, he stated that he can remember when to go to the doctor.   The police were called during one incident where Lange went to the Crider Center to get more sleeping pills and the hospital refused. The longest Lange has gone without sleep is seven days. Lange testified that he goes to the hospital if he does not sleep for three days. He stated that he had been to the hospital twenty times in the past year for this issue.

The ALJ asked a vocational expert to consider an individual of Lange's education, training, and work experience, who could perform light work, climb stairs and ramps occasionally, never climb ropes, ladders, or scaffolds, stoop, kneel, crouch, and crawl. The vocational expert was also asked to assume that the individual can understand, remember, and carry out at least simple instructions, non-detail tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine, simple work changes, and perform repetitive work according to seizure, sequence, and pace. The vocational expert testified that such an individual could work as a storage facility rental clerk or an office helper. According to the expert, there were approximately 3,015 jobs for storage facility rental clerks and 1,440 jobs for office helpers in Missouri. Next, the ALJ asked the vocational expert to assume in addition to the previous hypothetical that the individual could respond appropriately to supervisors and co-workers in a task or setting where contact with others is casual and infrequent. The vocational expert testified that such an individual could be an office helper or a garment sorter. The vocational expert estimated that there are 1,890 jobs for garment sorters in Missouri. The ALJ then asked the vocational expert to assume in addition to the previously stated facts that there is a sit, stand option at the work site, with the ability to change positions frequently. The vocational expert testified that this limited such an individual's options to a coin machine collector, and that there are approximately 655 jobs as a coin collector in Missouri. Finally,

the ALJ asked the vocational expert to assume in addition to the previously stated facts that the individual would need two additional breaks beyond the normal two breaks in a regular day, and the individual would be absent three times a month. The vocational expert testified that there were no jobs fitting these criteria.

### Medical Records

Lange was initially seen by Dr. Nanda for an evaluation of depression on January 6, 2009, prior to the alleged onset of disability. Lange complained of having difficulty sleeping and "feel[ing] bad like someone would feel if he lost his family." Dr. Nanda determined that Lange suffered from depression, anxiety, and insomnia. The doctor noted that claimant had no suicidal thoughts, showed an ordered thought content, normal new learning ability, normal recent memory, and normal remote memory. Dr. Nanda prescribed Trazadone and Paxil.

On August 10, 2009, Lange visited the office of Dr. Fowler complaining of lower back pain. This doctor's appointment occurred over one month after the alleged date of disability onset, July 5, 2009. The lumbar and lumbosacral discomfort was described as dull, tingling, numb, and continuous. On a scale of 0 to 10 with 10 being the worst, Lange described the intensity of discomfort as a 6. According to Lange, the discomfort was noticeable only 20% of the time. Lange told Dr. Fowler the symptoms had been present for the past several months. Dr. Fowler diagnosed him with a lumbar sprain or strain, lumbosacral segment dysfunction, lumbosacral sprain or strain, and a lumbar muscle spasm. Cryotherapy reduced the discomfort. Manual treatment occured during this visit, and Lange reported "feeling better."

Lange was seen again on August 11, 2009 and August 12, 2009 by Dr. Fowler. Region manipulation and manual therapy occurred during the visit. The diagnosis remained the same. Dr.

Fowler repeatedly treated Lange (August 13, 2009, August 17, 2009, August 19, 2009, August 20, 2009, August 24, 2009, August 26, 2009, August 27, 2009, August 31, 2009, September 2, 2009, September 8, 2009, September 11, 2009, September 15, 2009, September 29, 2009, October 6, 2009, October 19, 2009, October 27, 2009, November 3, 2009, November 12, 2009, November 23, 2009, December 10, 2009, December 16, 2009, January 4, 2010, and January 18, 2010). During each appointment, Lange reported feeling better or feeling "pretty good."

On September 17, 2009, Lange again visited Dr. Nanda complaining of pain in his lower right back. Though the right flank area was not tender on physical examination and he exhibited a normal range of motion, Lange was diagnosed with back pain and right flank pain. Dr. Nanda prescribed Skelexan and Arthrotec.

On February 1, 2010, Lange visited the office of Dr. Gross, a chiropractor, complaining of lower back pain. According to Lange, on a scale from 1 to 10 with 10 meaning severe pain, the pain was at a level 10. The pain was allegedly constant and had been ongoing for eight months. Lange stated that he was currently taking Vicodin. Lange stated that he was performing light labor with a moderate level of exercise each day. When asked on a form if he had difficulty sitting, standing, walking, bending, or lying down, Lange selected "other." Dr. Gross performed intersegmental traction on Lange's back. Lange visited Dr. Gross on February 5, 2010, February 8, 2010, February 12, 2010, February 17, 2010, and February 18, 2010. By his final visit, Lange reported feeling better.

On February 16, 2010, Lange went to the Barnes-Jewish St. Peters Hospital Emergency Department with complaints of back pain and headaches. Lange indicated that he had suffered from lower back pain for the past six months and visits to the chiropractor were not providing relief. He also indicated that he needed "some good pain meds" and that he was unable to take any more over-

the-counter medication. He denied taking any medication at the time. Lange was given intravenous drips of Zofran, Morphine Sulphate, and Dilaudid, and he was prescribed Percocet and Flexeril.

On March 29, 2010, Lange sought treatment from Dr. Wiewel for depression and back pain. Lange stated that he had never seen a doctor for these symptoms or been prescribed medication except a recent emergency room visit. Lange indicated that the pain was uncomfortable. He stated that he borrows pain pills from his sister. Dr. Wiewel noted that Lange appeared alert with normal mood, behavior, speech, dress, motor activity, and thought processes. Dr. Wiewel performed a back exam on Lange and determined that he had a full range of motion with no tenderness, palpable spasms, or pain on motion. Lange was prescribed Celexa and Mobic.

On March 30, 2010, an x-ray was conducted on Lange's spine. Dr. Cohen reviewed the results and determined that there was no evidence of fracture or dislocation. He concluded that there were only mild degenerative changes.

On April 3, 2010, Lange sought treatment at the Barnes-Jewish St. Peters Hospital Emergency Department. He complained of lower back pain, abdominal pain, and diarrhea. Lange denied taking home medications or having a private physician. The attending physician noted that Lange did not grimace or exhibit guarding behavior upon examination. Also, Lange demonstrated appropriate behavior and speech. Lange was prescribed Percocet for his lower back pain.

On April 8, 2010, Lange returned to Dr. Wiewel's office complaining of lower back pain. He denied a known injury and stated that he "cleans out foreclosures for realtors." Dr. Wiewel prescribed Percocet and Flexeril, but suggested that the medication was not long-term and to limit the use of them.

On April 13, 2010, Lange was seen by Dr. Graven. Lange complained of lower back pain that

had been ongoing the past six weeks. Dr. Graven noted that Lange had a negative straight leg raise, was able to heel and toe walk, and was able to lumbar flex with hands to toes. Dr. Graven placed Lange on a Medrol Dosepak and ordered an MRI. The MRI, conducted on April 22, 2010 on the lumbar spine, indicated early degenerative disc disease and minimal diffuse disc bulges. Dr. Graven referred Lange to a pain management facility.

On April 28, Lange followed up with Dr. Wiewel regarding his depression. Dr. Wiewel again noted Lange's normal mood, behavior, speech, dress, motor activity, and thought processes. Lange admitted that he had not been taking Celexa due to its side effects and requested Klonopin. Dr. Wiewel refused to prescribe Klonopin because it is addictive. He was prescribed Cymbalta. Dr. Wiewel suggested that he check into the Crider Center.

On May 6, 2010, Lange visited Dr. Boedefeld, a pain management specialist. Lange described the pain in his lower back as sharp, aching severe pain. He indicated that he suffers from numbness in his legs and occasional weakness. Dr. Boedefeld noted that Lange appeared well groomed and nourished and did not exhibit any signs of undue depression or anxiety. Dr. Boedefeld discussed interventional treatments with Lange, but Lange indicated he could not afford these. Dr. Boedefeld refilled Lange's prior prescription of Percocet. He instructed Lange to use the medication sparingly and advised that it should last for six weeks. He also prescribed Neurontin.

On May 21, 2010, Lange returned to Dr. Wiewel requesting sleep medication and pain medication. Dr. Wiewel indicated that Lange was not doing "anything proactive for his depression or the back pain." For the first time, Lange stated that he had been treated in the past for bipolar disorder. Dr. Wiewel prescribed Lexapro and Abilify for his assessment of depression with possible bipolar disorder. Because Lange had not responded to any attempts at treatment, Dr. Wiewel noted

8

he needed to see a psychiatrist. She also prescribed Lange a limited number of Percocet. Dr. Wiewel indicated that Lange would receive "no further refills"from her and that he "needs to see pain management."

On May 24, 2010 at 10:26 a.m., Lange sought treatment at Barnes-Jewish St. Peters Hospital Emergency Department. He complained of chronic back pain and requested cortisone injections. He indicated that he was out of Percocet. Lange walked out at 11:18 a.m. after triage.

On May 24, 2010 at 11:56 a.m., Lange went to the SSM St. Joseph Hospital West Emergency Room. He complained of back pain for the past six months and a toothache for the past week. He indicated that he had run out of Percocet. Lange's physical examination showed mild para lumbar tenderness. Naprosyn was prescribed.

On May 25, 2010, Lange was seen by Dr. Gendi.  He complained of lower back pain, which was not relieved by Naprosyn, difficulty sleeping, and racing ideas. Lange was referred to pain management and psychiatry. Lange was prescribed Klonopin.

On July 2, 2010, Lange returned to Dr. Gendi complaining of back pain, difficulty sleeping, and racing of ideas, which was not controlled with Klonopin. Dr. Gendi noted that Lange had not had lab work in two years, but Lange refused because he had no insurance. Dr. Gendi offered to have Lange seen by a psychiatrist that day, but Lange refused. Dr. Gendi referred him to the Crider Center. He increased the dosage of Klonopin, started Lange on Paxil, and continued his prescription of Lexapro. Dr. Gendi also prescribed Valium. Dr. Gendi indicated that if Lange was not willing to followup with a psychiatrist, he could not see him as a patient anymore.

On July 7, 2010, Lange was seen by Dr. Gendi complaining of difficulty sleeping. He indicated that he had taken all of the Klonopin since his last visit. He was also taking Ambien and

still having difficulty sleeping. Dr. Gendi prescribed Ativan, Ambien, Lexapro, and Klonopin. Dr. Gendi referred Lange to the Crider Center.

On July 22, 2010, Angela Freeman, a single decisionmaker (SDM), completed a physical residual capacity questionnaire regarding Lange. The primary diagnosis was lumbar spine degenerative changes. The SDM determined that Lange could occasionally lift and carry up to 20 pounds and could frequently lift or carry 10 pounds. Lange could stand and/or walk a total of 6 hours in an 8 hour workday, and he could sit for a total of 6 hours in an 8 hour workday. He could push and/or pull an unlimited amount. The SDM indicated that Lange could climb ramps, stairs, ladders, rope, and scaffolds occasionally, and could stoop, kneel, crouch, and crawl occasionally. He could balance frequently. There were no manipulative, visual, or communicative limitations. The SDM determined that Lange should avoid concentrated exposure to extreme heat or cold and hazards. He could have unlimited exposure to wetness, humidity, noise, vibration, fumes, dust, odors, gases, and poor ventilation.

 On July 22, 2010, Dr. Sutton completed a psychiatric review technique form regarding Lange. Dr. Sutton found moderate restrictions of daily activities and moderate difficulties in maintaining social functioning. He determined there were mild difficulties in maintaining concentration, persistence, or pace. Dr. Sutton deemed Lange's allegations "mostly credible." Lange did not allege marked limitations in functioning related to mood disorders. There were some limitations related to stress and motivation. According to Dr. Sutton, the evidence suggested a capacity to function in a low demand setting. He also concluded that the lack of intensive treatment suggests a possibility that the impairments were not severe. He requested that a Mental Residual Functional Capacity Assessment (MRFCA) be prepared.

10

Dr. Sutton conducted an MRFCA on Lange on July 22, 2010. Dr. Sutton concluded that Lange appeared able to understand, remember, and carry out complex instructions. Lange appeared to have the capacity to interact with others on a limited contact basis, and he appeared able to adapt to moderately complex, low-change work settings.

On August 15, 2010, Lange was seen at the SSM St. Joseph Hospital West Emergency Department. He stated that he had fallen from a ladder three days prior. X-rays and CT scans showed two fractured ribs and a talus fracture to his left ankle. A splint was placed on his left ankle, and he was prescribed Norco for pain.

On August 17, 2010, Lange returned to the SSM St. Joseph Hospital West Emergency Department complaining of suicidal ideation. Lange stated that he had already taken all of his medication prescribed two days prior. According to Lange, the pain was making his suicidal thoughts worse. Lange requested additional pain medication. He was referred to another doctor for depression.

On August 18, 2010, Lange visited the SSM St. Joseph Health Center Wentzville Emergency Department. The doctor noted that Lange was seen at the West hospital for foot pain and a psychological evaluation which resulted in an admission at the Wentzville hospital. Lange later signed himself out from the psychiatric floor and went directly to the Wentzville Emergency Department seeking pain medication. Lange was prescribed Percocet.

On September 8, 2010, Lange sought treatment at the Crider Center. Lange stated that he had fallen from a ladder one week prior.  He indicated that he had not been seen for his bipolar disorder in fifteen years, and he had never been hospitalized for his bipolar disorder. Lange indicated that he felt delirious and had not slept in twenty days. He stated that he had not experienced pleasure or fun in years. The doctor noted that an inspection of Lange's back revealed no abnormality. There was

normal flexion and extension and no tenderness. The doctor indicated that Lange was oriented to time, place, person, and situation and had no racing of ideas. He had a blunted affect, but no suicidal ideation. Dr. Anderson prescribed Seroquel for his bipolar symptoms. Lange indicated that he had received a Percocet prescription the day before, so no pain medications were prescribed. The doctor recommended a plan to slowly taper narcotic medications. Dr. Anderson indicated reservations regarding chronic pain management with opioids. Dr. Anderson suggested crutches and to avoid bearing weight on the injured leg.

On September 14, 2010, Lange was seen at SSM St. Joseph Hospital West complaining of foot and rib pain from fall. Lange indicated that he had run out of Percocet and the medicine did not alleviate his pain. The doctor expressed concern and discussed the case with Lange's primary care physician, Dr. Gendi. Central intake was contacted. Lange was prescribed Percocet.

On September 16, 2010, Lange returned to the Crider Center for a followup appointment. Lange complained of a painful foot and ribs and chronic back pain. He stated that the pain was "out of control." He also indicated that he was not sleeping or eating well. The doctor noted that Lange's affect was normal, and he was oriented to time, place, person, and situation. Lange stated that he had run out of Seroquel. The doctor prescribed Zyprexa for Lange's bipolar affective disorder and suggested that Lange taper off the Percocet in two weeks.

On September 29, 2010, Lange was seen at the Crider Center by Dr. Raza. He complained of anxiety, depression, and insomnia. He stated that he was currently taking Lexapro. The physician diagnosed him with bipolar disorder (depressed, non-psychotic) and major depressive disorder (recurrent, non-psychotic). He was prescribed Klonopin and Prozac.

On September 29, 2010, Lange visited the Emergency Department at SSM St. Joseph

12

Hospital West. Lange was gone when the physician attendant entered the exam room. Fifteen minutes later, he was still "nowhere to be found."

On September 30, 2010, Lange was seen at the Crider Center by Dr. Anderson. Lange sought medication refills. Lange stated that he had run out of Percocet six days ago. Lange complained of continued pain and an inability to sleep. Lange indicated that he was dissatisfied with his last visits because Dr. Anderson would not prescribe Klonopin and Valium as Lange requested. Lange stated that Dr. Anderson did not understand bipolar disorder. Dr. Anderson noted that Lange was taking much more than prescribed and it had been six weeks since Lange's injurious fall. Ambien was prescribed for Lange's insomnia. Ibuprofen was prescribed for Lange's complaints of pain. Dr. Anderson noted that Lange was "out of the acute pain window." Dr. Anderson determined that it was "medically inappropriate to prescribe further narcotics for pain control" and listed several reasons. First, he concluded that Lange was "deceptive" during his first visit when he had just received a prescription for Percocet the day before from another physician. Second, he determined that Lange consistently took pain medications "MUCH more frequently than prescribed." Third, followup x-rays showed healing of fractures, a physical exam was unremarkable, and his gait was normal. Dr. Anderson concluded that Lange was not an appropriate candidate for long-term opiates as part of chronic pain management because his alleged back pain was substantiated by "minimal objective finding" and "normal x-rays/MRI." According to Dr. Anderson, Lange had a history of alcoholism and was at "high risk for prescription drug abuse" in light of the fact that he deliberately withheld pertinent medical information. Lange used multiple providers to obtain prescriptions. He also "use[d] pain meds way in excess of the directions." Lange indicated that he was unhappy with Dr. Anderson's care, and he intended to get a prescription from the emergency department.

13

On October 1, 2010, Lange visited Dr. Gendi's office. He stated that he needed pain pills. Lange indicated that his lower back and rib pain was more controlled with Percocet. Dr. Gendi increased Lange's Klonopin prescription, restarted him on Lexapro, and started him on Ativan. He also prescribed Percocet but decreased the dosage.

On October 6, 2010, Lange requested Ambien from Dr. Raza at the Crider Health Center. Dr. Raza reviewed Dr. Anderson's letter which advised that Lange had been abusing benzodiazepines, pain medications, opiates, and sleep medications for "quite some time." The letter also advised that Lange had been getting his medications from multiple providers. In light of Dr. Anderson's advisement, Dr. Raza indicated that he would not prescribe Ambien and would discontinue the Klonopin prescription. He also indicated that on Lange's next visit, he would recommend a rehabilitation program to get weaned off benzodiazepines.

On October 13, 2010, Lange was seen by Dr. Raza at the Crider Center for his depression and bipolar disorder. Lange stated that he still suffered from insomnia and his depressive symptoms were not alleviated with Prozac. Dr. Raza noted that Lange kept repeating that he needs to give him something stronger to help his depression and insomnia. Dr. Raza prescribed Licoz, Prozac, Klonopin, and Ambien.

On November 8, 2010, Lange sought treatment at the SSM Depaul Health Center for diarrhea, a urinary tract infection, and insomnia. Antibiotics were prescribed for the urinary tract infection and Lomotil was prescribed for diarrhea. The doctor directed Lange to seek treatment for his insomnia from his psychiatrist.

On November 15, 2010, Lange was transported by ambulance to the emergency room at SSM St. Joseph Health Center. Lange had taken seven or eight Ambien pills over a fifteen- hour period.

According to police affidavit, Lange told Crider Center staff several times he was going to jump off a bridge if he didn't get his sleeping medications refilled. Crider Center staff subsequently called an ambulance. Lange was hospitalized for presenting with suicidal tendencies, though he denied suicidal or homicidal thoughts. Lange stated that he had been taking Ambien for insomnia but it was ineffective. He stated he only slept two or three hours a night for the past two or three months. He was scheduled for an appointment at Crider Center with Dr. Raza the morning of November 15, but the appointment was changed. Lange told the staff that he could not wait until December for his appointment because "he will no longer be around." Lange denied telling the staff he was going to jump off a bridge. Lange indicated that the situation had been blown out of proportion. A drug test was conducted and indicated possibly toxic levels of benzodiazepines in Lange's system. Lange was cleared and admitted to see Dr. Wang, a psychiatrist. Dr. Wang diagnosed Lange with sedative, hypnotic, or anxiolytic abuse and major depressive disorder. Dr. Wang planned to start therapy and avoid benzodiazepines. Lange was discharged on November 19, 2010 from St. Joseph Health Center Behavioral Medicine. He was prescribed Cipro, Klonopin, Desyrel, and Effexor.

On November 17, 2010, the Medical Director of the Crider Center strongly advised that Lange no longer be prescribed controlled medications at this point or in the future. Dr. Boyd noted that Lange was at extremely high risk for abuse and self harm while on controlled medications. Dr. Boyd concluded that Lange was "obviously seeking controlled drugs and abusing controlled drugs." Dr. Boyd indicated that Lange had overdosed on Ambien by taking a month long supply over one weekend and was currently hospitalized for depression and addiction.

On December 1, 2010, Dr. Raza completed a Medical Assessment of Ability to Do Work-Related Activities. Dr. Raza indicated that Lange was "very unstable," did not reliably take

15

medications as prescribed, "tends to overtake med[ication]s," and "may be addicted to pain killers, tranquilizers and sleep med[ication]s." In a checklist form, Dr. Raza indicated that Lange had poor/no useful ability to function in every work-related area except maintaining physical appearance. Areas that Dr. Raza indicated as poor/none included the ability to follow work rules, maintain attention/concentration, deal with the public, use judgment, understand, remember, and carry out simple instructions, and function independently.

On December 8, 2010, Lange and his sister, who now had power of attorney, visited Dr. Raza's office.  Lange's sister stated that Lange had been hallucinating and had psychotic delusions. She stated that he had a manic episode in October when  he went with two men he did not know and was robbed. He was diagnosed with bipolar I disorder. Dr. Raza prescribed Effexor, Klonopin, and Seroquel.

On December 28, 2010, Lange was seen at SSM Depaul Health Center. Lange stated that he needed Klonopin. Lange indicated that he had been having increased anxiety and panic attacks. He stated that he had been taking Klonopin three times a day but had run out and could not get in touch with the Crider Center. When asked about suicidal or homicidal ideations, Lange appeared irritated and stated "I am tired of answering these question[s]. You need to either prescribe me my Klonopin or I am leaving." The doctor noted that Lange seemed "very focused on obtaining benzodiazepines." Lange stated that he was experiencing depression, nervousness, and anxiety. The doctor also indicated that "[t]here is a high possibility of the patient wandering from emergency room to emergency room requesting benzodiazepines." Lange was discharged on December 29, 2010. Lange was diagnosed with a global assessment of function score of 52. The doctor indicated that Lange's prognosis was questionable.

**Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the claimant's education, background, work history, and age;

(3) the medical evidence from treating and consulting physicians;

(4) the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness, and side effects of medication;
>
> 5. functional restrictions.

*Id.* at 1322.

### The ALJ's Findings

The ALJ found that Lange was not disabled within the meaning of the Social Security Act from July 5, 2009 through the date of the decision. He issued the following specific findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since July 5, 2009, the alleged

onset date of disability (20 C.F.R. §§ 404.1571 *et. seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, residuals from a fractured left ankle, and a bipolar disorder (20 C.F.R. §§ 404.152(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant can only occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl. The claimant can never climb ropes, ladders, or scaffolds. The claimant can understand, remember, and carry out at least simple instructions and non-detailed tasks, and demonstrates adequate judgment to make simple work-related decisions. The claimant can respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent. The claimant is able to adapt to routine, simple work changes, and can perform repetitive work according to set procedures, sequence, or pace.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416. 965).

7. The claimant was born on February 10, 1972 and on July 5, 2009, the alleged onset date of disability, was 37 years old, which is defined as a younger individual age 18-49 (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. §§

20

404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

## Discussion

On appeal, Lange raises two issues. First, Lange claims that the ALJ's findings of residual functional capacity (RFC) are legally insufficient because the decision fails to point to some medical evidence supporting a finding of RFC. Second, Lange argues that the hypothetical question posed to the vocational expert was not supported by substantial evidence, and that therefore, the vocational expert's response is not substantial evidence upon which the ALJ's decision may rest. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

## I. RFC Determination

A claimant's RFC is the most he or she can do despite physical and mental limitations. RFC is assessed based on all the relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(1); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a

professional," because a claimant's RFC is a medical question. *Lauer*, 245 F.3d at 704.

The ALJ determined that Lange had the residual functional capacity to perform light work except that he could only occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl. The ALJ concluded that Lange can never climb ropes, ladders, or scaffolds. According to the ALJ, Lange can understand, remember, and carry out at least simple instructions and non-detailed tasks, and demonstrates adequate judgment to make simple work-related decisions. The ALJ found Lange able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent, able to adapt to routine, simple work changes, and able to perform repetitive work according to set procedure, sequence, or pace.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Estes v. Barnhart*, 375 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks and citation omitted). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if such an opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). However, the treating physician's opinion should only be given great weight if it is based on sufficient medical data. *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating physicians are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data) (internal quotation marks and citation omitted). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001); *see also* *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion

does not automatically control or obviate the need to evaluate the record as a whole).

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch*, 201 F.3d at 1013 (internal quotation marks and citation omitted); *see also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating physician's opinion limited weight if it is inconsistent with the record). Also, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2p clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." *Id.* at *5. When determining the weight to be given to the opinion of a treating doctor, the entire record must be evaluated as a whole. *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999) (internal citation omitted). An ALJ is entitled to give less weight to a treating physician's opinon where the doctor's opinion is based largely on the plaintiff's subjective complaints, rather than on objective medical evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (citing *Vandenboom v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004)).

Lange first argues that the ALJ erred in disregarding the opinion of Dr. Raza, a physician who drafted a psychological evaluation of Lange.  Dr. Raza diagnosed Lange with bipolar II disorder and major depressive disorder, recurrent, non-psychotic. In evaluating Dr. Raza's opinion, the ALJ held:

23

On December 1, 2010, Syed Raza, M.D., prepared a psychological evaluation of the claimant. Although there is no indication as to whether Dr. Raza did a mental examination of the claimant, Dr. Raza stated that all the claimant's occupation adjustments, performance adjustments, and personal-social adjustments were poor to none, except for the claimant's ability to maintain his personal appearance. Dr. Raza did note that she believed the claimant was at high risk to abuse his medications. Dr. Raza diagnosed the claimant with a bipolar II disorder and a major depressive disorder, recurrent, non-psychotic. There are no tests to support Dr. Raza's conclusions, nor is Dr. Raza one of the claimant's treating physicians. Given the lack of testing, Dr. Raza's limited contact with the claimant, and Dr. Raza's blanket conclusions without supporting details, no weight is given to Dr. Raza's opinions.

Here, the ALJ acknowledged Dr. Raza's opinion and then properly assigned it no weight. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist should not have been given controlling weight because the doctor had only met with the plaintiff three times at the time he completed the form). The opinion was inconsistent with the objective evidence of record and was not supported by clinical and laboratory findings. Moreover, the severity alleged by Dr. Raza was unsupported by every other medical record submitted to the ALJ. The ALJ summarized the records as follows:

The claimant states that his depression, bipolar, and anxiety disorder prevented him from working, but the medical records not only contradict the alleged severity of the claimant's alleged mental disorders, [] there is little to no evidence of a medically determinable anxiety disorder with panic attacks as alleged by the claimant.
With respect to the alleged intensity and frequency of the claimant's symptoms, there is no indication of independent medical treatment rendered to the claimant by a psychologist or psychiatrist. The lack of medical findings cannot support the allegations of a severe medical impairment that would cause the claimant to be disabled for twelve or more consecutive months in duration. The above-mentioned treatment notes and the statements and objective medical findings contained within, strongly undermine the claimant's credibility....

24

> The lack of medical treatment records fails to present any documented medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits, with respect to the claimant's mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment, insight, cognitive function or behavior, lasting twelve consecutive months in duration despite strict compliance with prescribed treatment.

The ALJ properly discounted Dr. Raza's opinions because there were major discrepancies between his evaluation and the other medical evidence in the record, including his own records. The ALJ considered the opinions of Dr. Wiewel, Lange's primary care physician, Dr. Spencer, and various attending physician's treatment notes from Lange's multiple emergency department visits. Thus, substantial evidence supports the ALJ's finding that the record did not support Dr. Raza's blanket conclusions set forth in his checklist psychological evaluation of Lange. *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding the ALJ properly discounted medical opinion because it was conclusory "consist[ed] of three checklist forms, cite[d] no medical evidence, and provide[d] little to no elaboration"); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague conclusory statements."); *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (finding "the checklist format, generality, and incompleteness of the assessments limit their evidentiary value").

Lange next argues that the ALJ's decision failed to cite any medical evidence to support its finding of RFC in light of his alleged mental and physical limitations. The Eighth Circuit has noted

that "[i]t is the ALJ's responsibility to determine the claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of [his] limitation." *Jones v. Astrue*, 819 F.3d 963, 971 (8th Cir. 2010) (internal quotation marks and citation omitted). In making his RFC determination, the ALJ considered Lange's medically determinable physical impairments and the extent to which the alleged symptoms were consistent with the objective medical evidence, the medical evidence of record, and Lange's testimony about his daily activities and subjective complaints.

The ALJ discussed Lange's subjective complaints of hallucinations and panic attacks and found them to be unsupported by the objective medical evidence. The ALJ also considered Lange's subjective complaints of disabling physical and mental limitations and deemed them not credible. According to the ALJ, Lange's testimony at the hearing was "contradictory." Lange testified that he had been seeing a pain management doctor for two months, but the record showed this statement to be false. He was repeatedly advised to see a pain management specialist, but he did not do so until May 2010. When the pain management specialist refused to prescribe additional Percocet, Lange never returned or sought any other pain management treatment. Lange testified at the hearing that he prepares his own meals, mows the lawn, does laundry, drives alone, handles his money, and does not need to be reminded to go places. He also testified that he gets along well with others. The ALJ determined that Lange's testimony and his activities of daily living as set forth in his Function Report "are inconsistent with his allegations of a disabling impairment, call into question his credibility, and detract from his alleged symptoms and limitations." Lange's subjective complaints regarding the severity and intensity of his physical and mental impairments were inconsistent with the record as a whole. Thus, the ALJ properly discounted Lange's allegations. *See Cox*, 471 F.3d at

907 ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony."); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) ("[W]e defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence.").

The ALJ considered multiple sources of medical evidence in his determination that Lange did not suffer from a disabling physical impairment. Dr. Fowler, a chiropractor who treated Lange twenty-six times, noted "All orthopedic tests are negative." At every appointment with Dr. Fowler, Lange stated that he was feeling "better" or "pretty good." The ALJ gave significant weight to Dr. Graven's observation that Lange had a negative straight leg raise, was able to heel and toe walk, and was able to lumbar flex with hands to toes. An MRI conducted under Dr. Graven's orders showed only mild, degenerative changes and minimal disc bulges. The ALJ gave substantial weight to the opinions of Dr. Wiewel, Lange's primary care physician. Dr. Wiewel noted that there was no radiation of pain and Lange described his pain as only "uncomfortable." The ALJ considered multiple physical examinations of Lange that indicated he repeatedly had a normal range of motion, had no gait problems, and walked without difficulty. Regarding Lange's fractured ribs and ankle, the ALJ gave the Crider physician's opinion significant weight. While Lange claimed he was in extreme pain, the physician noted that Lange was out of the acute pain window and did not believe it was medically appropriate to prescribe further narcotics for pain control. The doctor observed that "the x-rays show[ed] healing of fractures and [the] physical exam [was] unremarkable and gait [was] normal." The ALJ also gave weight to  the Crider physician's observation that Lange was "not an appropriate candidate for long term opiates as part of chronic pain management based upon his DIRE score (back pain with minimal objective findings, normal x-rays/MRI)." The ALJ gave weight to the

Crider physician's notes that Lange was "at high risk for prescription drug abuse due to his deliberately withholding pertinent medical information and using multiple providers to obtain prescriptions." The ALJ determined that the opinions of the Crider physician on Lange's alleged physical limitations were consistent with the record and gave them significant weight. Substantial evidence and the record as a whole supports the ALJ's determination that Lange's physical impairments did not  rise to the level of a disability.

Regarding Lange's alleged depressive and bipolar disorder and anxiety, the ALJ gave some weight to Dr. Spencer's opinion. Dr. Spencer reported that Lange's mood was down and his affect was flat, but his flow of thought was intact and relevant and his insight and judgment were fairly intact. Dr. Spencer relied on Lange's self-reporting and diagnosed him with bipolar disorder and anxiety disorder. He determined that Lange had a GAF of 45-55, which indicated serious symptoms or any serious impairment in social and/ or occupational functioning. The ALJ also gave some weight to Dr. Wiewel's opinion as to Lange's mental status. Although not a psychiatrist or a psychologist, Dr. Wiewel repeatedly treated Lange for complaints of depression and anxiety. The ALJ considered Dr. Wiewel's notes that Lange seemed reluctant to follow some of her medical suggestions and that Lange had not responded to any of her attempts at treatment or her insistence that he seek psychiatric treatment. As previously discussed, the ALJ properly disregarded Dr. Raza's opinion due to a lack of testing, limited contact with Lange, and blanket conclusions. The ALJ properly relied on medical evidence and the record as a whole in his determination that Lange's mental impairments did not qualify as a disability.

The ALJ made the following findings:

> [T]he undersigned finds that the above-noted medical treatment

28

records, as well as: the inconsistencies on the claimant's part; the lack of statements, medical facts, and objective medical findings within the treatment notes; and the other medical and non-medical factors previously discussed, all fail to document limitations of function more restrictive than those within the above-stated residual functional capacity. The claimant is limited to the above-stated residual functional capacity and the record does not support his allegations of a more significantly limiting residual functional capacity. The claimant failed in his burden to establish otherwise through the medical records. As set forth above, these findings are consistent with the medical treatment records, the examination summaries, the objective medical findings, the inconsistencies and statements on the part of the claimant, the additional medical and non-medical factors, and the mental assessment by the State Agency psychologist.

The ALJ's RFC determination is supported by substantial evidence on the record as a whole. The ALJ recognized that Lange suffers from certain mental and physical impairments and accordingly determined that Lange could not even perform the full range of light work as defined by 20 CFR § § 404.1567(b) and 416.967(b). Additional limitations were placed on Lange's ability to do light work in light of the ALJ's recognition that Lange suffered severe impairments from degenerative disc disease, residuals from a fractured left ankle, and a bipolar disorder. However, the ALJ determined that these impairments were not disabling. Substantial evidence supports this conclusion. The ALJ's RFC finding is consistent with the credible medical evidence.

## II. ALJ's Hypothetical Questions

Lange contends that the ALJ's decision was not supported by substantial evidence. According to Lange, the ALJ posed flawed hypothetical questions to the vocational expert, as they did not fully capture the concrete consequences of his impairment. "While it is clear that 'questions posed to vocational experts...should precisely set out the claim's particular physical and mental impairments,' a proper hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true

29

by the ALJ.'" *House v. Shalala*, 34 F.3d 691,694 (8th Cir. 1994). Thus, "[a] hypothetical question...need only include impairments that are supported by the record and which the ALJ accepts as valid." *McKinney v. Apfel*, 228 F.3d 860, 865 (8th Cir. 2000).

As discussed above, the ALJ posed hypotheticals to the vocational expert which involved routine light work with limitations on physical activity and infrequent social interaction. These questions involved limitations different than those contained in Dr. Raza's opinion. However, the ALJ did not give weight to that opinion. As discussed above, the ALJ's decision was permissible. The ALJ's determination to discount Dr. Raza's opinion was based on substantial evidence and was adequately explained, so he was not required to include those limitations in his questions to the vocational expert. The ALJ posed one hypothetical that assumed the individual would need two additional breaks beyond the normal two breaks in a regular workday and would be absent three times a month. Though the vocational expert stated there would be no jobs available for such an individual, the ALJ permissibly discounted this testimony. The ALJ posed hypotheticals with an individual who could never climb ropes, ladders, or scaffolds, stoop, kneel, crouch, or crawl. The individual could understand, remember, and carry out at least simple instructions, non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine, simple work changes, and perform repetitive work. The individual had casual, infrequent contact with others. Even with these facts and an additional option to sit or stand at the work site, there were jobs available for such an individual.  The vocational expert stated that there were jobs available in significant numbers for an individual with Lange's impairments as an office helper, a garment sorter, or a coin machine collector. The ALJ properly relied on the other hypotheticals which adequately captured the concrete consequences of Lange's impairments as determined by the record as a whole.

30

The ALJ properly posed hypotheticals to the vocational expert and adequately considered the effect of all of the claimant's impairments that the ALJ found credible. The Commissioner met his burden of proving that the claimant was capable of performing other jobs in the national economy that are consistent with his medically determinable impairments, age, education, and work experience. Thus, the vocational expert's testimony that work exists in significant numbers for individuals with Lange's RFC constitutes substantial evidence on which the ALJ's decision was based.

For the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.  A separate judgment in accord with this Memorandum and Order is entered this date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 20th day of February, 2013.